```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

|                              |   |                           |
|------------------------------|---|---------------------------|
| UNITED STATES OF AMERICA,    | ) |                           |
|              Plaintiff,      | ) |                           |
|                              | ) | Criminal No. 13-10278-PBS |
|         v.                   | ) |                           |
|                              | ) |                           |
| PAUL BEY,                    | ) |                           |
|              Defendant.      | ) |                           |

**MEMORANDUM AND ORDER**

October 1, 2014

Saris, U.S.D.J.

Defendant Paul Bey has been charged with four counts of distribution of cocaine base, one count of being a felon in possession of a firearm and ammunition, and one count of possession with intent to distribute oxycodone. He now moves to suppress all evidence obtained as a result of the execution of an arrest warrant and subsequent search of the home of Clarissa Summons on July 29, 2013. He contends that the evidence was seized in violation of his Fourth Amendment rights because the police unlawfully (1) entered into Summons's home; and (2) searched a backpack containing, among other things, a firearm, ammunition, and oxycodone pills. At an evidentiary hearing on September 4, 2014, Detective Cristine Petruzziello of the Lynn Police Department, Special Agent Ronald Rushneck of the FBI, and Sergeant Scott Stallbaum of the Everett Police Department

1

testified on behalf of the government. Clarissa Summons testified on Bey's behalf. After hearing, Defendant's Motion to Suppress (Docket No. 51) is **DENIED**.

## FINDINGS OF FACT

On July 29, 2013, five officers from the Everett Police Department approached the home of Summons, who resided at 18 South Ferry Street, Apartment 1, in Everett, Massachusetts. Police had multiple arrest warrants for Bey, including one relating to a June 2013 incident in Lynn, Massachusetts where he allegedly assaulted a girlfriend with a gun. In the period after the incident, police had been unsuccessful in locating Bey in Lynn or at his most recent address in East Boston. Following this fruitless Bey-watch, the victim told police that Bey might now be staying with Summons at 18 South Ferry Street in Everett. Police was also aware that Summons had obtained an abuse prevention order prohibiting Bey from being within 100 yards of her residence.

At approximately 6:00 p.m., police officers knocked, and Summons opened the door. With their guns holstered, the officers informed Summons of the arrest warrants and asked if "Paul" was inside. Summons became visibly nervous and uncomfortable. After being asked again, Summons placed a finger to her lips and repeated the question out loud, "Is Paul in the house?" Summons looked towards her bedroom, kept her finger at her lips, and

2

stated aloud, "I don't think that he is here." Summons then slowly backed away, her finger still on her lips. The police interpreted Summons's actions as a clandestine attempt to communicate Bey's presence in the home and an invitation to enter. As a result, they drew their weapons and crossed the threshold, mindful that Bey might be armed. Meanwhile, Summons went into the back of the apartment to her son's bedroom.

Upon entering Summons's bedroom, Sergeant Strong saw Bey on the floor[1] and yelled at him to lie still and show the officer his hands. After the other officers rushed to the bedroom, Sergeant Stallbaum noticed a black backpack on the edge of Summons's bed and moved it away from Bey's reach to the center of the bed. It felt heavy, and the weight was unevenly distributed. After Bey was placed in handcuffs, officers asked him if the backpack belonged to him. He denied it, saying that the backpack belonged to Summons, not him. No Miranda warnings were given before this exchange. During the arrest, Summons was crying in the bathroom. She had invited Bey back into her house despite the restraining order, and he was staying there two to three times a week. The police allowed Summons to kiss Bey goodbye before he was transported to the police station.

---

[1] It is not clear from the testimony whether the police ordered him to get on the floor or whether he was attempting to hide. The police report said Bey was trying to hide. (Docket No. 56-1:4).

After Bey was taken out of the apartment, three officers (Officer McCabe, Sergeant Strong, and Sergeant Stallbaum) looked around Summons's apartment but did not search the backpack. Sergeant Stallbaum then went outside to obtain a "Consent for Search" form, and Officer McCabe asked Summons for the name, birthday, and social security number of her four-year-old child, expressing concerns about the child's safety if Bey had left a gun in the apartment. During this exchange, the officer also mentioned contacting the Department of Children & Families about the incident. However, Officer McCabe did not make any reference to removing her child from the home. Summons became concerned about the implications of the incident with respect to her son.

Shortly after, Sergeant Stallbaum, who did not participate in the earlier discussion about the Department of Children & Families or know about it, returned and approached Summons with a consent to search form, explaining that he wanted to search the apartment for a gun that Bey used to assault a girlfriend in Lynn. Sergeant Stallbaum sat down with Summons and described the terms of the form to her, including a provision stating, "I have a Constitutional right to refuse to allow a search . . . without a search warrant," and another provision indicating that Summons was "signing this form voluntarily, without threats, coercion, or promising of any kind." The officer also told Summons that if she chose not to consent, she and her child would have to leave for

several hours while the officers secured the apartment and applied for a search warrant. During this conversation, the officer did not mention the Department of Children & Families. Nor did the officer use any other threats or promises in an attempt to persuade Summons to sign the form. Summons signed the consent form and said the police could search the home. Although Summons testified she had an anxiety disorder, she was not hyperventilating, shaking, or visibly upset at the time she gave consent.

When asked about the ownership of the backpack, Summons told police that it belonged to her but that she was lending it to Bey. The police also asked her what was in it, and she replied that the backpack contained Bey's insulin kit. The police proceeded to search the backpack and found the insulin kit Summons described. More importantly, they also found a loaded firearm, ammunition, and oxycodone pills.

## CONCLUSIONS OF LAW

*1. Entry into Summons's Home*

At the outset, Bey argues that the police unlawfully entered Summons's apartment, and thus any evidence discovered must be excluded. This argument fails.

First, the police entered the apartment on the authority of the arrest warrant. When police are armed with an arrest warrant founded on probable cause, they may enter a dwelling if they

"reasonably believed" prior to entry that the subject of the warrant (1) resided at the apartment and (2) would be present. United States v. Graham, 553 F.3d 6, 12 (1st Cir. 2009). Some of the factors that have been considered in determining whether the police have a reasonable belief that the defendant resides at an address include police reports describing incidents involving the defendant at the address, information from third parties, and previous unsuccessful attempts to locate the suspect at other residences. Id. at 13.

With these principles in mind, the Court concludes that the arrest warrant authorized police to enter the home. Bey does not dispute that the warrant for his arrest was valid. Additionally, the police had information from the victim of the assault that Bey was now staying at 18 South Ferry Street in Everett, and they had been unable to locate him at his previous address. Before entering, Summons's actions also confirmed Bey's presence in the home. Although she said, "I don't think he is here," Summons kept a finger on her mouth, looked to her left, and then backed away from the door, communicating to police that Bey was in fact present. Based on these facts, the police could reasonably believe that Bey was present prior to entering.

Second, the police were also authorized to enter Summons's home based on her consent. See United States v. Floyd, 740 F.3d 22, 34 n.5 (1st Cir. 2014) (explaining that a homeowner's

6

voluntary consent to an entry into the home obviates the need for a warrant). The Court recognizes that the police did not ask to be allowed into the home, nor did Summons explicitly invite the police in. But Summons backed away from the door, all the while with her finger over her mouth, which could have reasonably been interpreted by the police as an invitation to enter. Indeed, Summons herself testified to waving the police into her apartment. See Robbins v. MacKenzie, 364 F.2d 45, 48-50 (1st Cir. 1966) (defendant consented to entry by stepping back from the door and allowing the officers to enter).

Summons testified that she believed she had no choice but to open the door for the police. As stated above, she is likely correct that she had no choice once she signaled that Bey was present. But it is well-established that the failure of police to advise a person of their right to refuse consent does not automatically render such consent invalid. United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008); see also Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973) (holding that the government is not required to demonstrate knowledge of a right to refuse as a prerequisite to establishing a voluntary consent). Rather, "[v]oluntariness is a question of fact that turns on the district court's comprehensive assessment of the totality of the circumstances attending the interaction between defendant/third party and the searching officers." United States v. Vanvliet, 542

F.3d 259, 264 (1st Cir. 2008). Here, the police did not engage in any inherently coercive tactics or otherwise communicate that compliance with their request was required. See United States v. Barnes, 506 F.3d 58, 63 n.6 (1st Cir. 2007) (noting that consent was not given voluntarily if it was coerced by threats or force, or granted only in submission to a claim of lawful authority). Their guns were not drawn. Nor is there anything about Summons's demeanor that would suggest that her ability to voluntarily consent was diminished. See United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999) (noting that voluntariness can also turn on a person's age, education, experience, and intelligence). As a result, the government has met its burden to show that Summons's consent to enter the home was knowingly, intelligently, and voluntarily given. For these reasons, Bey's challenge to the police's entry into the home misses the mark.

*2. Search of the Backpack*

Even if the police's entry into the home was authorized, Bey alternatively contends that the warrantless search of his backpack violated his Fourth Amendment rights. The government responds that (1) Bey voluntarily abandoned any privacy interest he had in the backpack when he told police that it did not belong to him; and (2) Summons voluntarily consented to a search of the backpack. The Court rejects the government's first theory but accepts the second.

To begin with, the Court disagrees with the government that Bey voluntarily abandoned his privacy interests in the backpack. "It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant." United States v. De Los Santos Ferrer, 999 F.2d 7, 9 (1st Cir. 1993). Numerous courts have emphasized, however, that the abandonment or disclaimer of ownership must be a "voluntary act." United States v. Gwinn, 191 F.3d 874, 877 (8th Cir. 1999); see also United States v. Austin, 66 F.3d 1115, 1118 (10th Cir. 1995) (holding that "[a]n abandonment must be voluntary"); United States v. Garzon, 119 F.3d 1446, 1451 (10th Cir. 1997) ("Abandonment will not be recognized when it is the result of prior illegal police conduct."); State v. Harbison, 156 P.3d 30, 35 (N.M. 2007) ("Because Defendant had not abandoned the evidence before he was seized, Fourth Amendment protections apply to the evidence."). In Gwinn, for example, the defendant's denial of ownership over a duffel bag came after he was seized and handcuffed by the police. 191 F.3d at 877. "Given this scenario," the Court concluded, "[his] actions can hardly be characterized as a voluntary act." Id.

As in Gwinn, the Court concludes that Bey's disclaimer of ownership was not a voluntary act. The exchange between Bey and police regarding ownership of the backpack took place just

9

minutes after the police entered Summons's home unannounced and arrested Bey at gunpoint. During his arrest, police also brandished their guns at Bey and told him to lie still and show them his hands. Importantly, the police also did not inform Bey of any of his <u>Miranda</u> rights, including his right to remain silent. Lying handcuffed on the floor with guns pointed at him, Bey's responses to the police's interrogation cannot be considered "the voluntary product of a free and unconstrained will." <u>Haynes v. Washington</u>, 373 U.S. 503, 514 (1963).

To be clear, the Court is not rejecting Bey's abandonment of the backpack simply because it was made without the benefit of <u>Miranda</u> warnings. The Court recognizes that "the physical fruits of an otherwise voluntary statement <u>are</u> admissible against a defendant even if a <u>Miranda</u> warning was wrongly omitted." <u>United States v. Parker</u>, 549 F.3d 5, 10 (1st Cir. 2008)(citing <u>United States v. Patane</u>, 542 U.S. 630, 642-42 (2004)); <u>see also</u> <u>United States v. Jackson</u>, 544 F.3d 351, 361 (1st Cir. 2008) ("The Supreme Court has held that physical evidence need not be excluded simply because it is discovered as a result of unwarned questioning in violation of <u>Miranda</u>."). Rather, the Court finds that Bey's abandonment was not voluntary for purposes of the Self-Incrimination Clause, given the inherently coercive environment in which Bey, handcuffed, was questioned by police with drawn guns. <u>See</u> <u>Patane</u>, 542 U.S. at 640 (recognizing that

10

the Self-Incrimination Clause contains its own exclusionary rule for evidence derived from involuntary statements). As a result, Bey maintained a reasonable expectation of privacy over the backpack, even though he disclaimed ownership of the bag during his arrest.

Putting abandonment aside, however, the Court agrees with the government that Summons voluntarily consented to a search of the backpack. Bey concedes that Summons possessed common authority to consent to a search based on her ownership and shared use of the backpack. (Docket No. 69:3); see United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) (explaining that common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes"). Instead, he argues that Summons's consent was obtained under duress because the police threatened to contact the Department of Children & Families.

It is well-established that "statements that a defendant's refusal to cooperate may lead to an extended separation from his or her loved ones" may contribute to a finding of coercion. United States v. Jacques, 744 F.3d 804, 811 (1st Cir. 2014) (citing United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981)); see also Lynumn v. Illinois, 372 U.S. 528, 534 (1963)(finding the defendant's confession involuntary where "oral confession was made only after the police had told her that state

financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate,'" among other factors). In <u>Tingle</u>, for example, the Ninth Circuit found a defendant's confession to be involuntary where agents made defendant "fear that, if she failed to cooperate, she would not see her young child for a long time." 658 F.2d at 1336. These coercive effects can be especially powerful when the police threatens the "primordial and fundamental" relationship of a mother to her child. <u>Id.</u> However, the "mere fact that a defendant is placed under some psychological pressure by agents does not necessarily render a confession involuntary." <u>Jacques</u>, 744 F.3d at 811 (quoting <u>United States v. Jobin</u>, 535 F.2d 154, 159 (1st Cir. 1976)).

In the totality of the circumstances, I find that the reference to reporting the incident to the Department of Children & Families was not so coercive as to render the consent involuntary. Sergeant Stallbaum left the home shortly after Bey's arrest to obtain a consent to search form. During this time, Officer McCabe asked Summons for the identifying information for her four-year old son and mentioned reporting the incident to the Department of Children & Families. As Bey acknowledges, the officer was likely a mandatory reporter under Mass. Gen. L. Ch. 119, § 51A, so his request for the information was legitimate and not improperly motivated.

12

In this stressful situation, Summons understandably felt pressure to be cooperative. But when Sergeant Stallbaum returned and asked Summons for her consent to search, he did not link the consent to search with any threats or promises relating to the Department of Children & Families. To the contrary, Sergeant Stallbaum sat down with Summons and carefully described the terms of the consent form to her, including a provision stating, "I have a Constitutional right to refuse to allow a search . . . without a search warrant," and another provision indicating that Summons was "signing this form voluntarily, without threats, coercion, or promising of any kind." Officer McCabe also did not participate in this conversation as Summons executed the consent form. Finally, although Summons had been crying while Bey was being arrested, she did not manifest any noticeable angst, apprehension, or anxiety when she signed the consent form. Compare Tingle, 658 F.2d at 1334 (defendant was "noticeably shaking"). As such, the police's actions here are distinguishable from other cases where courts have found coercion. See Lynumn, 372 U.S. at 534 (police threatened to take away children and welfare benefits if defendant did not cooperate); Haynes, 373 U.S. at 503 (police threatened defendant with continued detention if he did not confess and promised communication and access to family if he did); Tingle, 658 F.2d at 1336 (purpose and objective of interrogation was to cause fear that if defendant

failed to cooperate, "she would not see her young child for a long time"); Brown v. Horell, 533 F.3d 969, 981 (9th Cir. 2011) (police expressly conditioned defendant's ability to see the birth of his child with confession).

Given the limited coercive impact of Officer McCabe's single reference to the Department of Children & Families-as well as the other indicators of voluntariness-the Court finds that Summons's consent was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

Because the Court finds that the police's entry into Summons's home and the search of Bey's backpack was lawful, it is unnecessary to determine whether Bey had a reasonable expectation of privacy in the home or the backpack given his status as a violator of Summons's abuse prevention order. See United States v. Cortez-Dutrieville, 743 F.3d 881, 884-85 (3d Cir. 2014) ("Though most overnight guests have an objectively reasonable expectation of privacy, [the defendant] was not like most overnight guests . . . Importantly, [the host's] consent could not override the terms of the protection order.").[2]

---

[2] The government also argues in a two-sentence footnote that it would have inevitably discovered the gun by a warrant based on independent probable cause. Supp. Mem. of the United States at 5 n.5. But "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). For this reason, the government's passing reference to the inevitable discovery doctrine is deemed waived.

**ORDER**

Defendant's Motion to Suppress (Docket No. 51) is **DENIED**.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge

---

See id. ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").